**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

MICHAEL   MONTANEZ,   WILLIAM
RIVERA, and TROY COPELAND,

      Plaintiffs,

v.                                                                                      Case No:  6:15-cv-807-Orl-40DCI

JORGE CARVAJAL, TODD RAIBLE,
BRIAN    HENDERSON,    KYLE
BAINBRIDGE, JULIO RODRIGUEZ,
and EDWARD HART, in their individual
capacities,

      Defendants.

---

## ORDER

> *Lillian was bewildered by the enormous discrepancy which existed between Jay's models and what he painted. Together they would walk along the same Seine river, she would see it silky grey, sinuous and glittering, he would draw it opaque with fermented mud, and a shoal of wine bottle corks and weeds caught in the stagnant edges.*
>
> *. . . .*
>
> *Lillian was reminded of the talmudic words: "We do not see things as they are, we see them as we are."*[1]

This  civil  rights  case  arises  out  of  an  enormous  discrepancy  between  the

perceptions  of  police  officers  and  private  citizens  about  the  same  conduct.   What the

citizens considered to be innocent, everyday activity, the officers interpreted as anything

but.  The Court is now called to determine on summary judgment whether those officers

are immune from civil liability for how they responded to what they saw.

---

[1]    Anaïs Nin, *Seduction of the Minotaur* 124 (1961).

## I.    BACKGROUND

### A.    What Plaintiffs Saw

At the time of the events giving rise to this lawsuit, Plaintiffs, William Rivera ("Rivera"), Troy Copeland ("Copeland"), and Michael Montanez ("Montanez"), lived in a house together in Deland, Florida.  (Rivera Dep. 46:6–8; Copeland Dep. 18:13–19:8). Rivera, Copeland, and Montanez also worked together for Montanez's record label, where they created and promoted music.  (Rivera Dep. 26:11–24, 46:19–47:13).  To that end, the back of their house had been converted into a studio so the three could have a space dedicated solely to their music business.   The studio was separated from the house's main living area in such a way that Rivera, Copeland, and Montanez ordinarily accessed the studio through the backyard.  (*Id.* at 44:18–45:19).  As Rivera explains, anyone who wanted to enter the studio would first walk through the back door of the house into a small room referred to as a "safe room," and then walk through a second door into the studio.  (*Id.* at 56:7–57:12).  Both the back door and the door between the safe room and the studio could be locked.  (*Id.* at 56:20–57:4).

The morning of March 29, 2011, Rivera woke up and went about his day as usual. (*Id.* at 48:4–15).  He trekked across the street to the gas station to buy a sweet tea and a cup of ice, after which he returned home to make a sandwich.  (*Id.* at 48:22–49:9).  In the midst of preparing the sandwich, Rivera received a call from his cousin inviting him to visit New Jersey for the weekend.  (*Id.* at 49:8–10).  Excited, Rivera stopped what he was doing, shoved the kitchen knife he was using into the front pocket of his shorts, and stepped outside to get better reception.  (*Id.* at 49:12–14, 55:5–14, 62:19–63:6).  Rivera continued to talk with his cousin about the trip as he paced down the sidewalk in front of

the house.  (*Id.* at 63:7–12).  The cousin then stated that he had to get off the phone, but would call Rivera back in a few minutes with more details.  (*Id.* at 55:15–17).

Still teeming with excitement over the trip—this would be the first time in his life Rivera left Florida—Rivera decided to smoke a cigarette.  (*Id.* at 49:10–11, 55:17–20).  Since he left his pack of cigarettes in the studio, Rivera used a side street to walk from the front of the house to the back.  (*Id.* at 55:20–21, 63:7–64:1).  Rivera then entered the studio through the back door and retrieved his cigarettes.  (*Id.* at 55:21–23, 64:23–25).  Copeland was in the studio at the time working on a song, so he and Rivera started talking about Rivera's upcoming trip to New Jersey.  (*Id.* at 55:24–56:5, 62:11–13, 67:13–68:1; Copeland Dep. 19:14–25).  Rivera and Copeland then exited the studio so Rivera could smoke.  (Rivera Dep. 64:23–65:4; Copeland Dep. 19:14–20:6; Camera 1, 11:22:13).[2]

As Rivera and Copeland continued to talk immediately outside the studio, they noticed a car drive by that they had never seen before.  (Rivera Dep. 71:6–22; Copeland Dep. 20:11–14; Camera 2, 11:22:29–11:22:33).  Copeland felt that there was something strange about the car, so he walked out to the street to see where it was headed.  (Copeland Dep. 20:14–19; Camera 3, 11:22:55–11:23:08).  Copeland reached the roadway in time to watch the car disappear around a corner.  (Copeland Dep. 20:17–19).  Thinking nothing of it, Copeland returned to his discussion with Rivera.  (Copeland Dep. 20:19–22; Camera 3, 11:23:14–11:23:27).  Moments later, the car came speeding down the street and screeched to a stop at the back of the house where Rivera and Copeland

---

[2] Plaintiffs' house had an elaborate security system, including several surveillance cameras mounted throughout the inside and outside of the residence.  Defendants have provided surveillance footage produced by Plaintiffs during discovery starting near the time Rivera walked into the studio to retrieve his cigarettes.  (Raible Aff. Ex. O (video on file with the Court)).  The Court cites the surveillance footage according to the camera number located at the bottom left and the timestamp located at the top right of each video (the Court notes, and the parties agree, that the timestamps on the videos are behind by one hour).

were standing.  (Rivera Dep. 73:19–74:10; Camera 3, 11:23:47–11:23:56).  A man then jumped out of the car with a gun drawn, rushed toward Rivera and Copeland, and demanded that they get on the ground.  (Rivera Dep. 74:8–19; Copeland Dep. 20:23–21:22; Camera 3, 11:23:57–11:24:15).  Not knowing who this man was and in fear for their lives, Rivera and Copeland complied.  (Rivera Dep. 75:22–24; Copeland Dep. 23:2–10; Camera 1, 11:24:02–11:24:10).

It turned out that the man was an undercover police officer.  After more officers arrived at the scene, Rivera and Copeland were placed in handcuffs, searched, and escorted to a patrol car.  (Camera 1, 11:24:29–11:29:47).  Although Rivera attempted to explain that they lived at the house, the officers left him and Copeland in the back of the patrol car for two to three hours.  (Rivera Dep. 51:22–52:20, 78:19–80:8).  The officers later relocated Rivera and Copeland to the living room of the house where they were read their *Miranda* rights and briefly interrogated.  (Raible Aff. Ex. P (video on file with the Court)).  During the interrogation, Rivera and Copeland learned that the officers had obtained a search warrant and were in the process of searching the house.  (*Id.*).  Ultimately, Rivera was arrested on an outstanding child support warrant and Copeland was arrested for being in possession of a suspended driver's license.  (Raible Aff. ¶ 15).

### B.    What Defendants Saw

On March 29, 2011, Defendant, Todd Raible ("Officer Raible"), was on duty as a property crimes investigator for the Volusia County Sheriff's Office.  (Raible Aff. ¶ 2). Around noon that day, Officer Raible was driving in an unmarked patrol car to the Sheriff's district office in Deland.  (Raible Dep. 8:24–9:3).  Because the house in which Rivera, Copeland, and Montanez were living at the time was located near the district office, Officer Raible happened to pass the house on his way.  (*Id.* at 9:4–11).  As he drove by, Officer

Raible "observed a white male, early 20s, . . . wearing jean shorts talking on the phone on the corner" in front of the house. (*Id.* at 10:4–8). Officer Raible noticed that there were no vehicles in the driveway and that the man appeared "anxious" and "hunched" as he spoke on the phone. (*Id.* at 10:8–9; Raible Aff. ¶ 8). Officer Raible watched as the man proceeded to walk down a side street toward the back of the house, where he then saw a second individual "huddling or hunched by the back door," as if in a lookout position. (Raible Dep. 10:9–23; Raible Aff. ¶ 9). Knowing that there had been several recent daytime burglaries in the area, Officer Raible believed that the men were planning to commit a burglary. (Raible Dep. 10:10–15).

Officer Raible immediately broadcasted a burglary in progress over the radio and called for backup. (*Id.* at 10:24–11:3). Officer Raible then parked at a nearby gas station where he was soon met by Defendant, Jorge Carvajal ("Officer Carvajal"), who had heard Officer Raible's call. (*Id.* at 11:7–17; Carvajal Dep. 5:13–6:4, 6:14–23). Officer Raible quickly briefed Officer Carvajal on what he had witnessed and the two formed a plan to confront the situation. (Raible Dep. 11:18–25; Carvajal Dep. 6:24–7:10, 7:24–8:7). Officer Raible then drove to the house and turned down the side street the man had used to reach the back of the house. (Raible Dep. 11:21–12:5). As he passed by, Officer Raible again observed two men at the back of the house, one of whom appeared to conceal himself behind a wall as Officer Raible drove by in his unmarked car. (*Id.* at 12:6–14). Officer Raible turned around, relayed what he saw over the radio, and initiated contact. (Raible Dep. 12:15–17).

Officer Raible arrived at the scene first and parked on the side street near the back of the property. (Camera 3, 11:23:47–11:23:56). Officer Raible exited his vehicle, drew his firearm, and approached the two men as they stood near the back door of the house.

(*Id.* at 1:23:57–11:24:15).   Officer Carvajal arrived immediately after, also with his gun drawn.  (Camera 2, 11:24:13–11:24:28).   Officer Raible ordered the men to get on the ground, they complied, and Officers Raible and Carvajal placed them in handcuffs. (Raible  Dep.  14:11–15:4;  Camera  1,  11:24:02–11:24:14).    Knowing  that  burglars frequently work in teams, Officer Raible proceeded to open the back door,[3] entered into a small room, opened a second door, and announced into the house: "[S]heriff's office, come out if anybody's in there, sheriff's office."  (Raible Dep. at 17:11–25; Raible Aff. ¶ 16;  Rivera  Dep.  51:4–15;  Camera  1,  11:25:14–11:25:22;  Camera  13,  11:25:19– 11:25:26).  After hearing no response and seeing no victims or other accomplices, Officer Raible announced that the scene was clear, exited the house, and closed the door. (Raible Dep. 18:1–2, 18:13–20; Raible Aff. ¶ 17; Rivera Dep. 78:14–21; Camera 1, 11:25:26–11:25:30; Camera 13, 11:25:26–11:25:29).

Officer  Raible  returned  to  the  two  men,  searched  them  for  weapons,  and discovered two kitchen knives in one of the men's pockets.  (Raible Dep. 15:9–21; Raible Aff. Ex. C; Camera 1, 11:24:29–11:25:39).  When Officer Raible asked the man with the kitchen knives what he was doing at the house, Officer Raible says the man did not answer his question.  (Raible Dep. 16:3–17:10).  Officer Raible obtained the individuals' identifications, both of which disclosed addresses different from that of the house.  (Raible Aff. ¶ 13).  Officer Raible then waited for other officers to arrive so they could search the residence.  (Raible Dep. 18:17–24).

---

[3]   Officer Raible testified at his deposition that he noticed that the back door was ajar and that this is what caused him to enter the house.  (Raible Dep. 17:10–19).  However, Officer Carvajal testified at his deposition that he did not remember the door being ajar and that it appeared to him that Officer Raible opened the door from a closed position.  (Carvajal Dep. 14:20–15:6).  A surveillance camera mounted above the back door also shows Copeland closing the door and pushing it shut after he and Rivera exited the house, corroborating Officer Carvajal's recollection that the door was closed when Officer Raible opened it.  (Camera 1, 11:22:13–11:22:22).

Shortly thereafter, Defendants, Kyle Bainbridge ("Officer Bainbridge"), Edward Hart ("Officer Hart"), and Julio Rodriguez ("Officer Rodriguez"), arrived at the scene. Together, Officers Bainbridge, Hart, Rodriguez, and Carvajal entered the house through the back door and searched the residence. (Bainbridge Aff. ¶ 3; Hart Aff. ¶ 3; Rodriguez Aff. ¶ 3; Carvajal Aff. ¶ 4; Camera 1, 11:30:40–11:36:09; Camera 13, 11:31:10–11:36:05). During their search, the officers spotted marijuana and drug paraphernalia in plain view on a counter. (Bainbridge Aff. ¶ 3; Hart Aff. ¶ 3; Carvajal Aff. ¶ 4; Raible Aff. Ex. L). After completing the search, the officers exited the house and informed their supervisor and Defendant, Brian Henderson ("Lieutenant Henderson"), about what they had seen. (Henderson Aff. ¶ 4). Lieutenant Henderson then entered the house with Officers Bainbridge, Hart, and Carvajal to view the drugs. (*Id.*). Lieutenant Henderson subsequently called a narcotics investigator to determine whether a search warrant should be obtained for the remainder of the house. (*Id.*). When the narcotics investigator arrived, Officer Raible escorted the investigator into the house to view the drugs. (Raible Dep. 21:2–6; Raible Aff. ¶ 20). A warrant was eventually obtained and Officer Raible entered the house again to assist in the search. (Raible Dep. 22:20–23:3). The search ultimately yielded $18,150.00 in U.S. currency which had been hidden inside a closet wall, along with other miscellaneous drugs and paraphernalia. (Raible Aff. Ex. C). No charges were ever filed relating to the drugs and paraphernalia, and it was later determined that the money lawfully belonged to Montanez. (*Id.*).

## C.   Procedural History

Plaintiffs initiated this lawsuit in state court on March 27, 2015, after which Defendants removed. Plaintiffs then filed a sixteen-count Amended Complaint, which

remains their operative pleading.  Of those sixteen counts, four remain.[4]  In Count XI, Montanez alleges that Lieutenant Henderson and Officers Carvajal, Raible, Bainbridge, Rodriguez, and Hart unlawfully entered his house in violation of the Fourth and Fourteenth Amendments.  In Count XII, Montanez alleges that Lieutenant Henderson and Officers Carvajal, Raible, Bainbridge, Rodriguez, and Hart unlawfully searched his house in violation of the Fourth and Fourteenth Amendments.  And in Counts XIII and XIV, Copeland and Rivera respectively allege that Officer Raible unlawfully seized them in violation of the Fourth and Fourteenth Amendments.  All four counts are brought pursuant to 42 U.S.C. § 1983.  Defendants now move for summary judgment.

## II.    STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment. Fed. R. Civ. P. 56(c)(1)(A).  "The court need consider only the cited materials," but may also consider any other material in the record.  Fed. R. Civ. P. 56(c)(3).

A factual dispute is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.*  The moving party bears the initial burden of identifying those portions of the record

---

[4]    The Court previously dismissed two § 1983 false arrest claims and ten state law tort claims at the pleadings stage.  (*See* Docs. 36, 44).

demonstrating a lack of a genuine factual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). If the movant shows that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to demonstrate that there are, in fact, genuine factual disputes which preclude judgment as a matter of law. *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).

To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-movant must go beyond the pleadings and "identify affirmative evidence" which creates a genuine dispute of material fact. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998). In determining whether a genuine dispute of material fact exists, the court must read the evidence and draw all factual inferences therefrom in the light most favorable to the non-moving party and must resolve any reasonable doubts in the non-movant's favor. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587.

## III.    DISCUSSION

Defendants move for summary judgment on the ground that they are entitled to qualified immunity on all of Plaintiffs' claims. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To receive qualified immunity, a government official "must first prove that he was acting within the scope of his

discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)) (internal quotation marks omitted).  A government official acts within his discretionary authority when he "perform[s] a legitimate job-related function . . . through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).  "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194.  To do so, the plaintiff must demonstrate that the facts of the case, if proven true, would make out the violation of a clearly established constitutional right.  *Wate v. Kubler*, 839 F.3d 1012, 1018 (11th Cir. 2016).

### A.   Officer Raible's Seizure of Rivera and Copeland

Although Rivera and Copeland argue otherwise, the record reflects that Officer Raible was acting within his discretionary authority at all relevant times.  Officer Raible was on duty as a property crimes investigator for the Volusia County Sheriff's Office when he observed what he believed to be a burglary in progress.  Officer Raible radioed for backup, confronted and detained the suspects, and assisted in the ensuing investigation. These acts are all legitimate police functions which were within his power to perform.  The burden therefore shifts to Rivera and Copeland to demonstrate that Officer Raible violated their clearly established constitutional rights.

Rivera and Copeland assert that Officer Raible violated their constitutional rights by stopping and detaining them outside their house and for continuing to detain them until they were ultimately arrested.  The Fourth Amendment certainly prohibits unreasonable seizures by police, "and its protections extend to brief investigatory stops of

persons . . . that fall short of traditional arrest."[5]  *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  In order to conduct an investigatory stop, a police officer must have reasonable suspicion that the individual is engaged in criminal activity.  *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).  While not as demanding of a standard as the probable cause necessary to effect an arrest, reasonable suspicion requires the officer to have more than a hunch or a feeling that the individual is involved in a crime.  *Arvizu*, 534 U.S. at 274. Instead, a police officer who conducts an investigatory stop must be able to articulate specific, objective facts which, when considered with the totality of the surrounding circumstances, would cause a reasonably prudent person to believe that the individual has committed, is committing, or is about to commit a crime.  *United States v. Lewis*, 674 F.3d 1298, 1303 (11th Cir. 2012).

Although a police officer who conducts an investigatory stop without reasonable suspicion violates the Fourth Amendment, he is nevertheless immune from civil liability if he had arguable reasonable suspicion.  *See Jackson v. Sauls*, 206 F.3d 1156, 1165–66 (11th Cir. 2000) ("When an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion . . . .").  Arguable reasonable suspicion exists when a reasonable officer facing the same circumstances could have believed that he had reasonable suspicion to conduct

---

[5]    The Fourth Amendment to the United States Constitution provides as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  The Fourth Amendment's guarantees are made applicable to the states through the Due Process Clause of the Fourteenth Amendment.  *Mapp v. Ohio*, 367 U.S. 643, 655 (1961).

an investigatory stop.  *See Brent v. Ashley*, 247 F.3d 1294, 1303 (11th Cir. 2001). "Whether the officer's suspicion ends up being mistaken is immaterial so long as it was reasonable." *Whittier v. Kobayashi*, 581 F.3d 1304, 1309 (11th Cir. 2009) (per curiam).

It is clear from the record that a reasonable officer facing the same circumstances as Officer Raible could have believed that reasonable suspicion existed to stop and detain Rivera and Copeland.  Officer Raible was driving through an area he knew had suffered a rash of recent daytime burglaries when he happened upon Rivera standing, at noon, in front of a house which had no cars in the driveway.  Officer Raible observed Rivera acting suspiciously while talking on his cell phone and then watched as Rivera walked from the front of the house down a side street to the back, an unusual path for anyone who lived at the residence.  As he continued to watch, Officer Raible noticed that Copeland was also at the rear of the house in what appeared to be a lookout position.  When Officer Raible passed by a second time after conferring with Officer Carvajal, he again saw Rivera and Copeland near the back door of the house, and he saw Copeland move behind a wall as he approached in his car.  Based on these circumstances, a reasonable officer could conclude that Rivera and Copeland were committing a burglary.  Officer Raible therefore had arguable reasonable suspicion to conduct an investigatory stop.

After confronting and initially detaining Rivera and Copeland, Officer Raible's suspicions only increased.  Upon searching Rivera for weapons, Officer Raible found two kitchen knives in his pockets.  Officer Raible then noticed fresh pry marks near the handle of the back door, possibly made by the kitchen knives he had just discovered.  Further, when Officer Raible obtained Rivera's and Copeland's identifications, both listed addresses different from the house, indicating that neither lived there.  With these new facts and given the totality of the circumstances, a reasonable officer could continue in

the belief that Rivera and Copeland were committing a burglary.  Officer Raible therefore had arguable reasonable suspicion to continue detaining Rivera and Copeland until a full investigation had concluded.  For these reasons, Officer Raible is entitled to qualified immunity on Rivera's and Copeland's unlawful seizure claims.

### B.     Defendants' Entry into and Search of Montanez's House

Although Montanez argues otherwise, the record reflects that Lieutenant Henderson and Officers Carvajal, Raible, Bainbridge, Rodriguez, and Hart were also acting within their discretionary authority when they entered and searched Montanez's house.  All officers assisted in securing a potential crime scene and conducting an investigation upon finding illegal drugs and paraphernalia in the house.  These acts are legitimate police functions which were within Defendants' power to perform.  The burden therefore shifts to Montanez to demonstrate that Defendants violated his clearly established constitutional rights.

Montanez asserts that Lieutenant Henderson and Officers Carvajal, Raible, Bainbridge, Rodriguez, and Hart violated his constitutional rights by entering and searching his house numerous times without obtaining a warrant.  The right of every citizen to be free from unreasonable government intrusion into his or her home forms "the very core of the Fourth Amendment," *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)) (internal quotation marks omitted), and it is by now axiomatic "that searches and seizures inside a home without a warrant are presumptively unreasonable," *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)).  As a result, "absent exigent circumstances, a warrantless entry [into one's home] to search for weapons or

contraband is unconstitutional even when . . . there is probable cause to believe that incriminating evidence will be found within." *Id.* (quoting *Payton*, 445 U.S. at 587–88).

One type of exigency which may authorize an officer to search a home without a warrant arises when an individual is arrested inside the home.  In that circumstance, a police officer can, "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Maryland v. Buie*, 494 U.S. 325, 334 (1990).  Commonly referred to as a "protective sweep," the purpose of this type of brief and limited search is to ensure officer safety and to uncover potential victims of crime who might need assistance.  *See id.* at 335; *Brigham City v. Stuart*, 547 U.S. 398, 403–04 (2006).  It is well-established that a protective sweep must be limited to those areas immediately surrounding the location where the arrest occurred, and an officer must have reasonable suspicion to believe that a danger exists to search beyond that area, such as in non-adjoining rooms and on other floors of the house.  *See Buie*, 494 U.S. at 334.

However, when an arrest is made outside the home, officers are not entitled to perform the same protective sweep as they are when an arrest is made inside.  Instead, a police officer must have reasonable suspicion, based on specific, objective facts, to believe that an imminent danger exists inside the home to enter and search without a warrant.  *United States v. Scott*, 517 F. App'x 647, 649 (11th Cir. 2013) (per curiam), *cert. denied*, 134 S. Ct. 273 (2013); *see also United States v. McGough*, 412 F.3d 1232, 1237 (11th Cir. 2005) (holding that officers may enter and search a residence without a warrant when they "reasonably believe" that there are dangerous persons inside or individuals in need of aid) (quoting *Mincey v. Arizona*, 437 U.S. 385, 392 (1978)).  Regardless of whether an arrest is made inside or outside the home, the Supreme Court emphasizes

that a protective sweep is "not a full search of the premises" and must "last[] no longer than is necessary to dispel the [officer's] reasonable suspicion of danger." *Buie*, 494 U.S. at 335–36.

There is no dispute in this case that Rivera and Copeland were detained and arrested outside of Montanez's house. Consequently, the question for this Court is whether Defendants had reasonable suspicion to enter and search the house. And because they assert qualified immunity, Defendants need only establish arguable reasonable suspicion to escape civil liability. *See Jackson*, 206 F.3d at 1165–66.

Because Defendants entered Montanez's home several times over the course of the day, the Court finds it easiest to divide its analysis between the first entry performed by Officer Raible and all subsequent entries. Regarding the first entry, Officers Raible and Carvajal had just finished handcuffing Rivera and Copeland when Officer Raible opened the back door, entered the "safe room," opened the second door, and announced his presence into the house. While Officer Raible says that he noticed that the back door was slightly open and that this fact caused him to believe that other accomplices might be in the house, Officer Carvajal and the surveillance footage from the house refute his contention. Reading the evidence in Montanez's favor as the Court must, the Court infers that the back door was closed at the time Officer Raible opened it. As a result, Officer Raible must point to other objective facts which would cause a reasonable officer in the same circumstances to believe that there were accomplices or victims inside the house.

To that end, Officer Raible relies on his perception that Rivera and Copeland had committed a burglary and that, in his experience, burglars often work in teams and become violent. However, without more, Officer Raible's intuition—no matter how seasoned—is not enough to justify the warrantless entry. Officer Raible had no reason

to believe anyone else was in the house at the time.  When he first came across Rivera standing in front of the home on his cell phone, Officer Raible noticed that there were no cars in the driveway and that it appeared no one was home, which was consistent with what he knew about how the recent daytime burglaries in the area had been carried out. Further, while his knowledge and experience informed him that burglars tend to work in teams, Officer Raible had just detained two individuals who he believed were working in tandem.  Without pointing to an objective fact indicating that a third person was assisting in the purported crime, Officer Raible had no reason to believe anyone else was involved. The Court additionally notes that Officer Raible had not yet found the kitchen knives on Rivera, had not yet noticed the pry marks near the door handle, and had not yet checked Rivera's and Copeland's identifications (which listed addresses different from Montanez's house) when he entered.  In short, Officer Raible acted on nothing more than a hunch, and a reasonable officer in the same circumstances would have had no factual basis to believe that there was anyone inside the home.  Officer Raible's initial entry and search were therefore not supported by arguable reasonable suspicion.

Defendants' subsequent entries and searches were not supported by arguable reasonable suspicion either.  Upon announcing his presence and determining that there were no accomplices or victims inside, Officer Raible exited the house, closed the door, and returned to where Rivera and Copeland were lying on the ground in handcuffs. Defendants fail to identify any fact indicating that a danger arose at any point afterward. Indeed, the record reveals to the contrary.  After exiting, Officer Raible waited approximately five minutes for Officers Bainbridge, Rodriguez, and Hart to arrive so that they and Officer Carvajal could conduct a full search of the house.  During this time, Officers Raible and Carvajal searched Rivera and Copeland, asked them questions,

removed them from the scene, and secured them in the backseat of a patrol car, thus eliminating any possible danger they could have posed. Defendants cite, and the Court has found, no evidence of anything happening during this five-minute period which would cause a reasonable officer in the same circumstances to believe that a danger existed inside the house. Moreover, any possible fear of danger Defendants might have asserted during this five-minute period would be belied by the surveillance footage. A camera mounted above the door shows Officer Raible turning his back to the door for several seconds and another officer smiling and laughing as he stands near the door, conduct which seems inconsistent with a reasonable fear that a dangerous person might be lurking within a short distance. As a result, the Court finds that all subsequent entries and searches performed by Lieutenant Henderson and Officers Carvajal, Raible, Bainbridge, Rodriguez, and Hart lacked arguable reasonable suspicion as well.

None of the cases Defendants cite on summary judgment inform the Court differently. In *Guinn v. City of Riviera Beach*, 388 So. 2d 604 (Fla. Dist. Ct. App. 1980), a police officer was investigating a recent residential burglary. During his investigation, the officer encountered a storage building across the street where he found various illegal snakes being housed. *Id.* at 605. The officer then walked next door to the home of the person who owned the storage building in order to inquire about the snakes. *Id.* After knocking on the door and receiving no response, the officer saw a second door that stood slightly ajar. *Id.* The officer also observed a jalousie window immediately next to the door which had been pushed open in such a way that the inside doorknob could be reached from outside. *Id.* Believing that a burglary had occurred, the officer called for backup and entered the house. *Id.* The *Guinn* Court determined that, based on the officer's observations of the door and jalousie window paired with his knowledge that a burglary

had recently occurred nearby, the officer lawfully entered and searched the home under exigent circumstances. *Id.* at 606.

In *Davis v. State*, 834 So. 2d 322 (Fla. Dist. Ct. App. 2003), a concerned citizen called police to report what he believed was the burglary of his neighbor's house. When officers arrived at the house in question, they discovered that the front door had been forced open. *Id.* at 325. The officers then announced their presence and, after receiving no response, entered and searched the house. *Id.* The *Davis* Court similarly found this entry and search to be justified by exigent circumstances based on the indications of forced entry. *Id.* at 328.

In *State v. Haines*, 543 So. 2d 1278 (Fla. Dist. Ct. App. 1989), police also received a call from a concerned citizen reporting a possible burglary at his neighbor's house, who the neighbor knew was out of town at the time. When officers arrived later that night, they saw that the front door was open four to five inches and that no lights were on inside the house. *Id.* at 1279. When the officers announced their presence, they received no response. *Id.* The officers proceeded to enter and search the house for an intruder. *Id.* The *Haines* Court found that the open door late at night with no lights on in the house, coupled with the neighbor's statement that the homeowner was out of town, created exigent circumstances which justified the officers entering and searching for burglars or victims. *Id.*

In *State v. Mann*, 440 So. 2d 406 (Fla. Dist. Ct. App. 1983), an officer was assigned to investigate a rash of burglaries at an apartment complex. Dressed in plain clothes, the officer walked from floor to floor performing a security check. *Id.* at 407. As he approached one apartment, the officer noticed that a window screen next to the front door had been compromised, there were tool marks on the doorjamb, and the lock had been

damaged.  *Id.*  When the officer applied light pressure to the door, it swung open.  *Id.*
From outside the apartment, the officer could then see a chair which looked like it had
been propped against the door to keep it closed.  *Id.*  Believing that a burglary might be
in progress, the officer entered and searched the apartment.  *Id.*  The *Mann* Court found
that the officer's entry and search were justified by exigent circumstances based on the
numerous facts indicating a burglary had just occurred.  *Id.* at 408.

In *State v. Yee*, 177 So. 3d 72 (Fla. Dist. Ct. App. 2015), *review granted*, 2016 WL
1082745 (Fla. Mar. 16, 2016), police received a call from a concerned citizen reporting a
possible burglary at a neighbor's house.  The responding officer investigated and found
the rear window of the house had been broken and that the window frame had been
pulled outward.  *Id.*  The officer then attempted to contact the owners of the house, but
she was unsuccessful.  *Id.*  The officer proceeded to enter with her canine and searched
the house.  *Id.*  The *Yee* Court concluded that the officer's entry and search were justified
by exigent circumstances based on the broken window and the officer's inability to reach
the homeowners.  *Id.* at 76.

Finally, in *Dockery v. Doyle*, 237 F. App'x 426 (11th Cir. 2007) (per curiam), four
officers arrived at an apartment located in a high-crime area in order to speak with an
occupant regarding his alleged involvement in a prior armed robbery.  When the officers
reached the door to the apartment, they noticed that it was cracked open and that there
were tool marks on the doorframe.  *Id.* at 427.  The officers knocked and announced their
presence, but received no response.  *Id.*  One of the officers then heard footsteps coming
from inside.  *Id.*  Believing that a burglary was in progress, the officers entered and
searched the apartment.  *Id.*  The Eleventh Circuit ultimately determined that the officers'
entry and search were justified by exigent circumstances due to the indications of forced

entry, suspicious sounds coming from within the apartment, and the fact that the residence was located in a high-crime area.  *Id.* at 428–29.

What *Guinn*, *Davis*, *Haines*, *Mann*, *Yee*, and *Dockery* share—and what distinguishes them from this case—is that the officers pointed to specific, objective facts indicating that a criminal or a victim might be inside each residence.  The officer in *Guinn* saw an open door and a compromised jalousie window.  The officers in *Davis* saw that the front door had been forced open and received no response when they announced their presence.  The officers in *Haines* saw an open door at night with no lights on inside, and they knew that the homeowner was out of town at the time.  The officer in *Mann* saw a compromised window, damaged doorframe, tampered lock, and a chair which was used to prevent entry.  The officer in *Yee* saw a broken window, received no response when she announced her presence into the house, and could not make contact with the homeowners.  And the officers in *Dockery* saw an open door along with tool marks on the doorframe, and one officer heard footsteps inside the apartment.  Perhaps most importantly, however, no suspects had yet been detained in any of these cases, signaling to the officers that a person still might be inside each residence.  *See also, e.g.*, *United States v. Flores*, 380 F. App'x 921, 924 (11th Cir. 2010) (per curiam) (approving warrantless entry and search of home where officers knew six or seven suspects would be at house during drug sting, but officers only encountered three); *United States v. Burgos*, 720 F.2d 1520, 1526 (11th Cir. 1983) (approving warrantless entry and search of home where officers knew that multiple people would be at house during arms deal and that the house was laden with weapons and ammunition).

In contrast, the officers here are unable to point to any fact indicating that an accomplice or a victim remained in the house after they detained Rivera and Copeland

outside.  As for the first entry and search, record evidence contradicts Officer Raible's account that the back door was ajar when he arrived, and Officer Raible did not observe physical signs of forced entry until after he had already entered and searched the house. As for all subsequent entries and searches, there is no evidence demonstrating that a new danger arose after Officer Raible's initial search.  Officer Raible had already determined that no one was present inside the house, and he had already detained the two individuals he suspected of committing the burglary.  In sum, Defendants had no information suggesting that anyone—whether criminal or victim—remained in the house. *See Scott*, 517 F. App'x at 649 ("[O]fficers' lack of information about whether anyone inside the house posed any danger cannot be used to justify a protective sweep."); *United States v. Chaves*, 169 F.3d 687, 692 (11th Cir. 1999) (finding that a warrantless search of a warehouse could not be justified as a protective sweep where officers had no information indicating that a dangerous person was inside).  Accordingly, Defendants are not entitled to qualified immunity on Montanez's unlawful entry and search claims.

## IV.    CONCLUSION

Perception is everything in this case.  Despite what was actually innocent conduct, Officer Raible perceived Rivera and Copeland as committing a burglary.  Since Officer Raible's perception was objectively reasonable given the context of the situation, he is entitled to qualified immunity for detaining Rivera and Copeland.  However, Officer Raible and the other Defendants identify no objective fact which would cause a reasonable police officer in the same circumstances to perceive a danger inside Montanez's home.  For that reason, Defendants will proceed to trial on Montanez's unlawful entry and search claims.

It is therefore **ORDERED AND ADJUDGED** that Defendants' Dispositive Motion for Summary Judgment (Doc. 77) is **GRANTED IN PART** and **DENIED IN PART**.

Summary judgment is granted in favor of Defendant, Todd Raible, on Counts XIII and XIV

of Plaintiffs' Amended Complaint.  The motion is otherwise denied.

**DONE AND ORDERED** in Orlando, Florida on December 19, 2016.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record